**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**
**CLARKSBURG**

**UNITED STATES OF AMERICA,**

     **Plaintiff,**

**v.**                                 **Criminal Case No.: 1:24-CR-69**
                                           **(JUDGE KLEEH)**

**JESSE YOUNG GOBER,**

     **Defendant.**

**REPORT AND RECOMMENDATION, RECOMMENDING**
**THAT DEFENDANT'S MOTION TO SUPPRESS [ECF NO. 26] BE DENIED**

Pending before the undersigned United States Magistrate Judge is a motion to suppress evidence [ECF No. 26], which Defendant Jesse Young Gober ("Defendant") filed on February 19, 2025. By Referral Order dated February 20, 2025 [ECF No 27], the Hon. Thomas S. Kleeh, Chief United States District Judge, referred the motion to the undersigned for conducting a hearing and entering a report and recommendation as to disposition of the motion.

The Court also is in receipt of the Government's response to Defendant's motion, filed on March 25, 2025. [ECF No. 36]. The undersigned conducted a hearing on Defendant's motion on April 21, 2025, at which the Court heard witness testimony and accepted exhibits into evidence.

Based on a detailed review of Defendant's motion [ECF No. 26], the Government's response [ECF No. 36], the exhibits introduced into evidence at the hearing on Defendant's motion, and the testimony given by the witnesses at that hearing, and based on a thorough examination of pertinent legal authority, the undersigned **RECOMMENDS** that Defendant's motion be **DENIED**.

1

## I. FACTUAL AND PROCEDURAL BACKGROUND

Defendant stands accused in a multi-count Indictment which a Grand Jury returned against him on November 5, 2024. [ECF No. 1].  Defendant is charged in the Indictment as follows: (1) in Count One with Conspiracy to Possess with the Intent to Distribute and Distribute Controlled Substances, in violation of Title 21, United States Code, Sections 846, 841(a)(1) and 841(b)(1)(C); (2) in Count Two with Possession with Intent to Distribute 50 Grams or More of Methamphetamine, in violation of Title 21, United States Code, Sections 841(a)(1)  and 841(b)(1)(A)(viii); (3) in Count Three with Possession with Intent to Distribute Forty Grams or More of Fentanyl, in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(B)(vi); (4) in Count Four with Possession with Intent to Distribute Cocaine Base, in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(C); and (5) in Count Five with Possession of a Firearm in Furtherance of a Drug Trafficking Crime, in violation of Title 18, United States Code, Section 924(c)(1)(A)(i).

On or about October 9, 2022, Defendant and his then-girlfriend, Tammy Knotts ("Knotts"), were staying at a hotel, a Quality Inn, in or near Fairmont, Marion County, in the Northern District of West Virginia. Defendant and Knotts traveled to Ohio earlier that day in a rental car, to obtain drugs. They returned to the hotel in the evening. As they were returning to the hotel, Defendant and Knotts got into an argument, and Defendant struck Knotts in the face. By telephone, Knotts informed her mother, Brandy Floyd ("Floyd"), about the domestic violence. Floyd called 911 to report that Defendant and Knotts were involved in a domestic violence incident. Officers responded to the hotel and detained Defendant and Knotts to investigate the complaint. Upon detention, Defendant took a vial out of his pocket and informed officers that it contained fentanyl.

After the detentions, officers conducted a protective sweep of the hotel room, which revealed firearms, drug paraphernalia, and methamphetamine in plain view. Subsequently, officers obtained search warrants for the hotel room and the rental car. In the search of the hotel room and rental car pursuant to the warrants, officers found firearms, ammunition, cash, illegal drugs, and drug paraphernalia attributable to Defendant, giving rise to the charges herein.

Defendant challenges the propriety of the officers' detention of Defendant himself, arguing that there were insufficient constitutional grounds for the stop. But the Government argues that Defendant was lawfully detained resulting from the credible domestic violence complaint. Defendant also challenges the propriety of the officers' warrantless search of the hotel room. However, the Government contends that the warrantless search of Defendant's hotel room was a permissible protective sweep. Finally, the Government argues that even if the officers' protective sweep was improper, lawful discovery of the seized evidence was inevitable under the circumstances.

## II. SUMMARY OF TESTIMONY AND OTHER EVIDENCE

### A.  Witnesses and Exhibits from Suppression Hearing

During the Suppression Hearing on April 21, 2025, the Court heard sworn testimony from the following: (1) Deputy Roger Gump ("Gump") with the Marion County (West Virginia) Sheriff's Department ("Sheriff's Department"), (2) Knotts, who was Defendant's girlfriend at the time of events giving rise to the Indictment, (3) Special Agent Marcus Broadwater ("Broadwater") of the federal Bureau of Alcohol, Tobacco, Firearms, and Explosives, who is the case agent herein, (4) Floyd, who is the mother of Knotts and who placed a 911 call about a domestic dispute between Defendant and Knotts that led to Defendant's encounter with law enforcement, and which is the subject of his suppression motion, and (5) Defendant himself.

3

The Court received into evidence the following: (1) Government's Exhibit 1, the 911 CAD (computer-aided dispatch) log from the above-mentioned 911 call, and (2) Government's Exhibit 2, a search warrant issued by a state magistrate, per Gump's request, for the hotel room which Defendant and Knotts had been occupying. [ECF No. 41-2]:

### B. Gump's Testimony – Direct Examination

The Government called Gump to testify. According to his testimony,[1] Gump has been a deputy with the Sheriff's Department for approximately five years and, prior to that, served in the miliary police for approximately 15 years. [9:09:50 to 9:10:09]. Gump testified as to events of October 9, 2022, which gave rise to the Indictment herein. [9:10:12 to 9:10:50]. Specifically, Gump testified that he was on patrol on that date in the vicinity of Fairmont, West Virginia and responded to a 911 call for service. Id. The call, initiated by a third party, concerned a domestic dispute at a nearby hotel, which is a Quality Inn. Gump testified that the purported victim's mother was the caller. Id. Gump testified that he responded to the call along with a colleague, Deputy First Class Matthew Riffee ("Riffee"), also of the Sheriff's Department. Id. The officers arrived at the scene within five to 10 minutes of the call. Id.

More particularly, Gump testified as to Government's Exhibit 1, the CAD log of the 911 call. [ECF No. 41-1]. On the first page of the log, the name of the 911 caller is shown to be Brandy Floyd. [9:11:00 to 9:14:49]. The second page contains the command log, which reflects information that dispatch staff obtained verbally during the call. Id. This can reflect information gleaned from the 911 caller, as well as information relayed by responding officers. Id. The log reflects that the caller, Floyd, was Tammy Knotts' mother, and that Floyd was reporting a domestic

---

[1] The citations here to times in brackets correspond to the times of the Court's archived audio recording of the Suppression Hearing on April 21, 2025, which is located on the section of the Court's intranet site for FTR recordings.

dispute between Knotts and Knotts' boyfriend. Id. The incident was occurring at the hotel. Id. Floyd reported that the two were involved in drug dealing. Id. And it reflects that the male involved was threatening the caller and the girlfriend; specifically, the male stated: "If she calls the cops, I swear on my life I'll give her a reason for it." Id. The log shows that Floyd was not on site, but rather was talking on the phone with Knotts. Id. The log also shows that Knotts was "begging" Floyd to cancel the police response. Id. The male involved is shown to be Jesse Gober. Id. Gump testified that, as he was en route to the call, dispatch was relaying this information to him, in real time. Id.

Gump testified that when he arrived on the scene, he went into the hotel hallway. [9:14:58 to 9:16:34]. While he had preliminary information that Room 120 may be the one in question, he ultimately determined that Room 118, an adjacent room, was the one occupied by those who were the subject of the call. Id. Gump knocked on the door of Room 118 and Knotts came out of the room. Id. Gump did not recall Defendant being in or near the room at that time; mainly, Gump's recollection of Defendant was of him being in the hotel parking lot. Id. Gump instructed Knotts to come out of the room and sit on the floor. Id. Before the interaction with Knotts went further, Riffee called Gump out to the parking lot. Id. Thus, Gump did not enter the room at that time, nor did he conduct the eventual safety sweep of the room. Id. When Gump got to the parking lot, Riffee handed Gump a vial of suspected drugs, which had been taken from Defendant. Id. Riffee told Gump that Defendant had taken the vial out of his pocket and informed Riffee that it contained fentanyl. Id. Defendant was placed under arrest, and Gump transported him to the police station. Id.

Gump also testified about Government's Exhibit 2 [ECF No. 41-2], which is a search warrant that Gump sought and obtained for the hotel room. [9:16:40 to 9:18:28]. Gump

summarized the written narrative which he had prepared in support of his request for the warrant. Id. It is indicated in the narrative that, during officers' interaction with Defendant, he "reached into his right pants pocket and removed a small glass container which contained suspected fentanyl." Id. Further, it is indicated in the narrative that "A safety sweep of room 118 while speaking with the other party [2] revealed two firearms, glass pipes, and an undetermined amount of methamphetamine in plain view in a bag on the one tier dresser." Id. Gump testified that the information in the narrative regarding the safety sweep was relayed to him by Riffee, who was still on the scene at the hotel. Id. Gump explained that a state magistrate issued the warrant, and that when it was issued, Gump relayed that development to other officers back at the scene. Id.

As for the type of 911 call here, Gump testified that he has responded to "many" domestic calls. [9:18:30 to 9:20:22]. He stated that he responds to such calls at least once a week, and also frequently handled them as a military police officer. Id. Gump testified that domestic calls are risky insofar as those situations may turn violent. Id. He knows of instances of weapons being used in the course of domestic disputes. Id.

Gump testified that he was familiar with Defendant and Knotts, having responded a couple of times previously to calls concerning their residence. [9:20:42 to 9:21:17]. To this end, Gump knew of their past drug use. Id.

Gump testified that, based on the information relayed from the 911 call about Gober's and Knotts's drug trafficking activity that day, the recovery of suspected fentanyl from Defendant, and Gump's own knowledge about Gober's and Knott's past drug use, he would have sought a search warrant for the hotel room, even absent information gleaned from the safety sweep. [9:21:20 to

---

[2] The "other party" presumably is Knotts.

9:23:23]. And Gump testified that he would have arrested Defendant for the fentanyl possession, regardless of the results of the safety sweep of the hotel room. Id.

### C. Gump's Testimony – Cross-Examination and Re-Direct Examination

On cross-examination, Gump testified about the 911 command log and how such information reflected there is relayed to a responding officer in real time. [9:26:19 to 9:27:41]. The 911 dispatcher types, in shorthand, information provided by the caller, and then conveys that to the responding officer(s). Id. Gump explained that he attempts to absorb as much of this information as possible when responding to a call for service, but may not have a total command of all information which dispatch relays. Id.

Gump stated that he did not recall whether he saw Defendant immediately upon arriving at the hotel. [9:28:04 to 9:28:38]. He noted that another officer, a Trooper Maben ("Maben"), also responded and accompanied him to the hotel room. Maben did not take the lead; rather, he was there for safety purposes. Id.

Gump stated that when he knocked on the hotel room door, he asked Knotts what was going on. [9:28:40 to 9:31:25]. Gump did not recall any statement from Knotts in that moment. Id. Gump did not ask Knotts to come out of the room; she simply came out. Id. Gump testified that Knotts was detained, at least temporarily, because she was a purported victim and Gump was gathering information about the situation, including interviews of those involved in the dispute. Id. Maben continued to detain Knotts when Riffee called Gump out to the parking lot, by radio. Id. When Gump got to the parking lot, Riffee handed Gump the vial which Riffee recovered from Defendant. Id. Gump took Defendant into custody and transported him to the police station. Id. Riffee went into the hotel to take Gump's place there. Id.

Gump explained that the rooms at that hotel are accessible from the inside of the hotel. [9:32:14 to 9:33:24]. And he stated that the exterior door leading into the hotel from the parking lot was unlocked. Id. Gump did not speak with hotel staff to gain access to the property, and knows of no other responding officer who did so. Id. He stated that he had responded to that hotel in the past and always had been given access. Id. He acknowledged that the hotel is a private business and not public property. Id.

Gump testified that, when Knotts came out of Room 118, he was unsure if anyone else was in the room, because the door shut behind Knotts a moment after she exited. [9:33:32 to 9:34:59]. Gump could not get a meaningful look inside the room. Id. But he had no specific suggestion or perception that anyone else was inside the room. Id. From the information relayed by dispatch, as far as Gump knew, the matter was a domestic dispute involving two people. Id. Gump stated that there were no weapons on Knotts at the time she was detained. Id. And nothing in command log indicates there were weapons involved. Id.

When Gump first arrived and entered hotel, he corroborated information relayed from dispatch insofar as he recognized Knotts. [9:35:06 to 9:36:18]. Knotts did not appear to be injured, wounded, or otherwise physically abused, and Knotts gave no indication about past domestic problems. Id.

On re-direct examination, Gump testified that he has responded to "many" calls for service at the hotel involving drugs. [9:36:24 to 9:36:39].

### D.  Knotts's Testimony – Direct Examination

The Government called Knotts to testify.[3] According to her testimony, in October of 2022, at the time of the 911 call, she was 21 or 22 years old and in a relationship with Defendant. [9:38:22

---

[3] Knotts's legal counsel, Craig P. Erhard, was in the courtroom during her testimony. In response to questioning by the undersigned, Mr. Erhard indicated that Knotts had been advised of her constitutional

to 9:40:00]. She used drugs with Defendant regularly, but had not been a drug user prior to their relationship. Id. During their relationship, per Knotts, Defendant was selling drugs. Id. At the time of her testimony, Knotts stated, she had been clean for two years and had full-time employment in the coal industry. Id.

As for events of October 9, 2022, Knotts recalled the 911 call at issue. [9:40:02 to 9:41:12]. Knotts stated that she and Defendant had been in Ohio most of the day, and returned to the Fairmont area late in the day. Id. As she and Defendant returned to the Fairmont area, Knotts was talking with her mother on the phone. Id. During that telephone conversation, her mother reported the domestic dispute via a 911 call. Id. Knotts testified that when officers responded to the scene, they told her that she was "detained" but not fully "arrested." Id. Officers kept Knotts in the hotel hallway. Id.

Knotts recalled that, as for the travel to Ohio, she and Defendant left Fairmont early in the morning and returned approximately 7:00 p.m. or 8:00 p.m. [9:41:19 to 9:42:06]. In Ohio, Knotts and Defendant obtained drugs. Id. Upon returning to Fairmont, they went to the hotel. Id.

Knotts explained that Defendant rented the room. [9:42:11 to 9:43:08]. The two had stayed at that hotel earlier in the month. Id. As they arrived at the hotel, Knotts and Defendant got into an argument, while Knotts was on the phone with her mother. Id. While Knotts was not sure if it was intentional, Defendant hit her in the face. Id. Knotts told her mother about the hit to her face. Id. Knotts hung up the phone on her mother while her mother was also on the 911 call, and went into the hotel room. Id.

---

rights, including her Fifth Amendment right against self-incrimination. Also, the Government's counsel noted that the Government had entered into a plea agreement with Knotts, which contains a use immunity provision.

9

Knotts testified that, while she was on the phone with her mother, Defendant did not threaten Knotts herself. [9:43:11 to 9:44:29]. She stated that, more so, Defendant was verbally sparring with her mother. Id. And during the phone call with her mother, Knotts told her mother to not call the police; Knotts did not want to make the situation with Defendant worse. Id. But in short order, officers were on the scene at the hotel. Id.

Knotts stated that, when officers arrived at the hotel room, both she and Defendant were in the room. [9:44:30 to 9:46:38]. Knotts was unsure if officers could have seen into the room. Id. She recalled that two officers came to the room; one took Defendant outside and the other had Knotts step into the hallway, whereupon Knotts closed the door behind her. Id. Officers asked Knotts what happened, and Knotts responded that nothing happened. Id. Knotts testified that she was detained because an officer found a "tooter" on her person. Id. An officer talked with Knotts in the hallway for approximately 20 to 35 minutes. Id. Another officer eventually returned to the hotel room and opened the door to the room, which Knotts assumed they did because they had obtained a search warrant. Id. Knotts continued to talk with officers for approximately 45 minutes longer before she was transported. Id. Knotts testified that, after officers entered the room and conducted a proper search of it, she could see drugs in the room.[4] Id. She had a good view of the room because the door was open and she was sitting in front of it. Id. She acknowledged it was possible that officers could have seen into the room when they initially came to the room. Id.

### E. Knott's Testimony – Cross-Examination and Re-Direct Examination

On cross-examination, Knotts testified that, when officers first arrived at the hotel room, officers told her and Defendant that they were separating the two. [9:47:33 to 9:50:15]. Defendant

---

[4] It is not clear from Knotts's testimony whether she could see drugs in the room because they were in plain view before being handled by officers, or because they had been gathered by officers otherwise to be removed from the room.

and Knotts were not instructed to open the door; one of them simply opened it (she could not recall which). Id. Knotts stated that an officer searched her as soon as she and Defendant were separated, and found drug paraphernalia. Id. She recalled that two officers were with Knotts, and one was with Defendant. Id. As for the drug paraphernalia which the officer found on Knotts, Knotts stated that she had a "tooter" with fentanyl in it. Id. Knotts reiterated that officers told her that she was detained but not arrested, and that there was nothing to indicate that anyone other than Knotts and Defendant had been in the room. Id. Knotts denied to officers that there had been a domestic issue between her and Defendant. Id.

Knotts testified that there was no one else in the hotel room besides her and Defendant, and that there was nothing else which would have indicated to officers that anyone else was in the room. [9:50:40 to 9:50:58]. Knotts testified that, in the hotel room, the drugs were stored in the dresser and in the safe. [9:51:01 to 9:51:40]. She did not recall any drugs being in open view in the hotel room. Id. The drugs were stashed away. Id. She acknowledged that there could have been drugs lying about, but that she recalled that the drugs were put away. Id.

Knotts state that she was at the side door of the hotel when talking with her mother on the phone. [9:52:00 to 9:52:41]. She was sitting in a parked car and Defendant was standing outside of the car. Id. This is the location where Defendant hit Knotts in the face – while Knotts was inside the car and Defendant was standing outside of it. Id.

Knotts acknowledged that she lied to the police about nothing happening between her and Defendant. [9:52:43 to 9:53:55].  And she acknowledged that she lied to police when she told officers she did not know that drugs were in the hotel room and told them that the drugs were not in her possession. Id.

On re-direct examination, Knotts testified that Defendant had a gun. [9:54:03 to 9:54:20]. She could not recall whether the gun was in the hotel room during the events in question. Id.

### F.  Broadwater's Testimony – Direct Examination and Cross-Examination

The Government called Broadwater to testify. Broadwater testified that he is the case agent herein. [9:55:08 to 9:56:05]. He explained that he has worked for ATF since 2018, and prior to that, was a trooper with the West Virginia State Police since 2011. Id. Broadwater stated that he was not involved directly in the response to the 911 call which gave rise to this matter, or the resulting search of the hotel room. Id. Rather, his work on the matter came several months afterwards. Id.

As part of his investigation, Broadwater stated that he communicated with the manager of the hotel. [9:56:06 to 9:57:20]. Specifically, Broadwater interviewed the manager regarding policies and protocols concerning hotel guests, and specifically gleaned information about the rental of Room 118 on October 9, 2022. Id. Per Broadwater's interview, Defendant had begun renting the room on or about October 4, 2022, with extensions of the rental ultimately through October 10, 2022. Id.

Broadwater stated that the hotel manager he interviewed was Elizabeth Moran ("Moran"). [9:57:40 to 10:01:39]. From Moran, Broadwater learned hotel management's protocol is that, when a hotel guest is arrested, the remainder of the guest's stay is cancelled if there are multiple days remaining on the reservation. Id. And if the stay is for only one night or the arrest occurs on the last night of a multi-day reservation, then the reservation is terminated the next morning. Id.

Broadwater asked Moran about Defendant's arrest specifically, but Moran could not recall it. Id. However, in the situation where a guest is arrested, and the reservation cancelled as outlined above, then hotel protocol is for housekeeping to enter the room to clean it for the next occupant.

Id. Thus, per hotel protocol, housekeeping ultimately would have visited Room 118. Id. Moreover, per hotel protocol, if housekeeping staff discover firearms or suspected drugs, the staff is to leave the room immediately and the hotel staff is to contact law enforcement. Id.

On cross-examination, Broadwater testified that his conversation with Moran occurred in or about March of 2025. [10:01:43 to 10:03:45]. Broadwater explained that the information gleaned from Moran concern unwritten hotel policies. Id. Broadwater understood Moran to have been the hotel manager's position for quite some time, although he could not specify how long. Id. Broadwater did not interview housekeeping staff. Id. Broadwater acknowledged that, hypothetically, intervening third parties could have recovered the contraband from the hotel room before housekeeping staff entered the room. Id.

There was no re-direct examination of Broadwater.

### G.  Floyd's Testimony – Direct Examination and Cross-Examination

Defendant called Floyd to testify. Floyd testified about the call she placed a call to 911 on October 9, 2022. [10:06:23 to 10:07:14]. Floyd did not recall all details of what she told the 911 dispatcher. Id. But Floyd did recall that her daughter, Knotts, contacted her. Id. Knotts told Floyd that she had been hit, and so Floyd called 911. Id. Floyd recalled telling 911 that there was a domestic dispute involving her daughter. Id. Floyd remembered that her daughter was at a hotel, but as of the time of the Suppression Hearing, could not recall the name of the hotel. [10:07:20 to 10:09:17]. Floyd stated that she likely told the 911 dispatcher that drugs were involved. Id. Floyd did not recall giving a description of Defendant or Knotts to the dispatcher. Id.

Additionally, Floyd testified that she has been communicating with her daughter via text message throughout the day. [10:09:29 to 10:10:39]. Eventually, the two connected by telephone call. Knotts told Floyd that she and Defendant were fighting, and because of that, Knotts would

13

not be going to Floyd's location to retrieve the children that Floyd was babysitting. Id. Floyd testified that Knotts asked her to not call 911. Id.

On cross-examination, Floyd recalled Defendant threatening her during the call with Knotts. [10:11:21 to 10:11:43]. In particular, she recalled Defendant's statement, reflected in the 911 command log, and directed at Floyd, that "If she calls the cops, I swear on my life I'll give her a reason for it."

There was no re-direct examination of Floyd.

### H.  Defendant's Testimony – Direct Examination and Cross-Examination

Defendant testified on his own behalf. According to his testimony, he rented a hotel room with Knotts on October 9, 2022. [10:23:17 to 10:25:01].  Defendant observed Knotts having an argument over the telephone with her mother. Id. Defendant was asleep in the passenger seat of a vehicle while Knotts drove. Id. When Defendant and Knotts arrived at the hotel and stopped, Defendant woke up and perceived Knotts and her mother arguing over the telephone. Id. The argument appeared to be about how Knotts was supposed to be picking up children which her mother was babysitting. Id.

Defendant denied hitting Knotts. [10:25:09 to 10:25:16].

Defendant testified that while Knotts and her mother were arguing, Defendant woke up, got his bearings, and gathered items from the vehicle to go into the hotel room. [10:25:18 to 10:27:20]. He went into the hotel room. Id. At this time, police officers arrived at the hotel. Id. Defendant set the items down in the room. Id. Defendant then left the hotel room, and Knotts entered it at the moment he was leaving. Id. When he left the hotel room, Defendant exited the hotel and went to the parking lot where the vehicle was parked. Id.

14

Defendant stated that officers approached him in the parking lot and asked him who he was and what he was doing. [10:27:21 to 10:28:54]. Officers detained Defendant and searched him. Id. During the search, officers asked Defendant if there was anything on him. Id. Defendant gave over a container with an amount of a substance he thought was heroin, approximately one-half gram. Id. It was an amount that was a one-day supply. Id. Defendant was placed in the back of a police vehicle, and then taken to a police station. Id.

When Defendant was in the hotel room, he did not see any drugs or drug paraphernalia in plain view in the hotel room. [10:28:59 to 10:30:48]. Defendant explained that any drugs in the room were put away in furniture or other places, not in plain view. Id.

On cross-examination, Defendant did not dispute that there were drugs in the hotel room. [10:31:11 to 10:32:40]. Further, Defendant did not admit to possessing drugs in the hotel room; he admitted only to the having the drugs recovered during officers' search of his person in the parking lot. Id. Defendant did not recall obtaining drugs that day. Id. Defendant stated that, during their travels that day, he and Knotts visited gambling casinos but were not trafficking drugs. Id. Defendant did not recall firearms being in the hotel room; however, he stated that firearms were in the vehicle. [10:31:43 to 10:33:20]. As for the argument between Knotts and Floyd, which Defendant overheard, Defendant stated that he did not threaten Floyd or make the statement "If she calls the cops, I swear on my life I'll give her a reason for it." [10:35:48 to 10:38:20]. Defendant testified that, instead, he stated there was no need to call the police. Id. He testified that he otherwise tried to diffuse the argument between Knotts and Floyd. Id. Defendant could not recall what type of vehicle he and Knotts traveled in that day, and could not recall who owned it. Id. He recalled that it was a rental vehicle, but could not recall which rental company he may have used. Id.

There was no re-direct examination of Defendant.

### III. LEGAL ISSUES AND ANALYSIS

Defendant argues that there was no reasonable, articulable suspicion for his detention by law enforcement. He contends that there was no domestic violence scenario, and that any argument was between Defendant and her mother over the telephone. He stresses that Knotts asked that the 911 call for service be cancelled. Defendant also contends that, because the response to the 911 call was improper, then the protective sweep of his hotel room was unlawful, and any evidence derived from the incident should be accordingly suppressed.

The Government's argument is that Defendant was lawfully detained pursuant to a credible domestic violence complaint. The Government also contends that that the protective sweep of Defendant's hotel room was permissible because law enforcement was responding to a report of an ongoing domestic violence situation. Further, the Government argues that even if the officers' protective sweep was unlawful and the subsequent search warrant for the hotel room improper, the seized evidence is nevertheless admissible under the inevitable discovery doctrine.

### A. Legal Principles

As a foundational matter, the undersigned notes the well-established principle that the Fourth Amendment of the United States Constitution protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV.  Moreover, "the general rule [is] that every arrest, and every seizure having the essential attributes of a formal arrest, is unreasonable unless it is supported by probable cause." Michigan v. Summers, 452 U.S. 692, 700 (1981).

Short of formal arrest, an officer may perform a "investigatory stop" of a suspect supported by the officer's reasonable, articulable suspicion of criminal activity. United States v. Weaver, 282

F.3d 302, 309 (4th Cir. 2002) (citing Terry v. Ohio, 392 U.S. 1 (1968)). Further, instructive caselaw provides that reasonable suspicion arises from circumstances leading to a stop or search. Ornelas v. United States, 517 U.S. 690, 696 (1996). Such a stop is permitted by an officer if he or she "observes unusual conduct which leads him reasonably to conclude in light of his experience that criminal activity may be afoot." Terry, 392 U.S., at 30 (1968).

The Fourth Circuit has articulated: "The reasonable suspicion standard, like the probable cause standard, is a fluid concept which takes its substantive content from the particular context in which the standard is being assessed." United States v. Foreman, 369 F.3d 776, 781 (4th Cir. 2004) (citation omitted). Further, "reasonable suspicion is a 'commonsense, nontechnical' standard that relies on the judgment of experienced law enforcement officers, 'not legal technicians.'" United States v. Williams, 808 F.3d 238, 246 (4th Cir. 2015) (citation omitted). A court is to review the stop or search from the standpoint of an objectively reasonable police officer. Id. Specifically, "an investigatory stop must be justified by an objective basis to suspect that the particular person stopped is, or is about to be, 'engaged in a particular crime.'" United States v. Critchfield, 81 F.4th 390 (4th Cir. 2023) (quoting Kansas v. Glover, 589 U.S. 376, 397 n.1 (2020)). A 911 call can give rise to reasonable suspicion, justifying a defendant's detention, if it is non-anonymous and provides "detailed and precise" information. United States v. Quarles, 330 F.3d 650, 656 (4th Cir. 2003).

Moreover, "it is a cardinal principle that 'searches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions.'" Mincey v. Arizona, 437 U.S. 385, 390 (1978) (quoting  Katz v. United States, 389 U.S. 347, 357

(1967)). It is the Government's burden to demonstrate that one of these exceptions applies. Coolidge v. New Hampshire, 403 U.S. 443, 455 (1971).

One well settled exception to the warrant requirement is the "protective sweep" doctrine established under Maryland v. Buie, 494 U.S. 325, 327 (1990). Law enforcement may perform a protective sweep of a private residence when they have "articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." Buie, 494 U.S., at 334 (citations and quotations omitted). A protective sweep is not "a full search of the premises, but rather extends only to a limited inspection of those places where a person may actually be found… [and] may last no longer than needed 'to dispel the reasonable suspicion of danger.'" United States v. Green, 599 F.3d 360, 376 (4th Cir. 2010) (quoting Buie, 494 U.S., at 335–36)). Further, a defendant's ultimate arrest location being outside of the home does not affect the protective sweep analysis. United States v. Laudermilt, 677 F.3d 605, 613 n.2 (4th Cir. 2012) (citing United States v. Jones, 667 F.3d 477, 485 n. 10).

Law enforcement is justified in performing a protective sweep in response to a "potentially volatile situation" that involves unseen or unaccounted-for third-parties. Laudermilt, 677 F.3d at 605-612. (upholding protective sweep where "clear, objective evidence of an emergent situation [exists] involving domestic violence and a firearm.") Further, an officer's concern for the "immediate safety" of a domestic violence victim, combined with knowledge of a suspect's volatile behavior can provide grounds for a protective sweep. United States v. Gwinn, 219 F.3d 326, 331 (4th Cir. 2000) (justifying protective sweep performed based on police dispatch advising that defendant was drunk, brandishing a gun, threatening to kill the victim, and previously "had problems" with law enforcement).

Another well-settled exception to the warrant requirement is the inevitable-discovery doctrine established under Nix v. Williams, 467 U.S. 431, 432-433 (1984). The inevitable-discovery exception "allows the government to use information obtained from an otherwise unreasonable search if it can establish by a preponderance of the evidence that law enforcement would have 'ultimately or inevitably' discovered the evidence by 'lawful means.'" United States v. Bullette, 854 F.3d 261, 265 (4th Cir. 2017) (quoting Nix, 467 U.S., at 444). The Government must demonstrate, by a preponderance of the evidence, that (1) officers "legally could have uncovered the evidence", and (2) officers "would have done so." United States v. Jenkins, 671 F. Supp. 3d 704 (N.D.W.Va. 2023) (citing United States v. Allen, 159 F.3d 832, 840 (4th Cir. 1998)).

The inevitable-discovery doctrine may apply where a hotel room is searched after the short-term guest's rental period has expired or has been lawfully terminated. United States v. Ross, 964 F.3d 1034, 1039-1043 (11th Cir. 2020) (noting that evidence in hotel room would have been inevitably discovered by housekeeping staff who "need to—and [have] the authority to—access the room to clean and prepare it for the next registered guest, often on a very tight turnaround.") A short-term hotel guest "does not have a reasonable expectation of privacy" after his rental period is lawfully terminated. United States v. Kitchens, 114 F.3d 29, 31 (4th Cir. 1997) (holding that law enforcement's warrantless entry into a hotel room was lawful because the occupants had stayed past check-out time).

Additionally, the inevitable discovery doctrine may apply where law enforcement has probable cause to obtain a search warrant. United States v. Allen, 159 F.3d 832, 840–41 (4th Cir. 1998). The Government must produce evidence, however, "that the police would have obtained the necessary warrant absent the illegal search." Id., at 841. The Government can establish this by showing that law enforcement "took steps to obtain a warrant prior to the unlawful search." Id.

(citing United States v. Lamas, 930 F.2d 1099, 1103 (5th Cir. 1991)). "[T]he existence of probable cause for a warrant, in and of itself and without any evidence that the police would have acted to obtain a warrant, does not trigger the inevitable discovery doctrine…" Id.

Finally, a well-established principle is that of the exclusionary rule. This rule holds that a court should exclude evidence that is obtained as a result of law enforcement's unlawful arrest or search. See Mapp v. Ohio, 367 U.S. 643 (1961). Relatedly, however, a court should suppress evidence in a criminal matter "only … where its deterrence benefits of exclusion outweigh its substantial social costs." Hudson v. Michigan, 547 U.S. 586, 591 (2006) (citations and quotations omitted).

**B. Analysis**

In the case at bar, the necessary sequential analysis is as follows. The first issue is whether law enforcement had reasonable, articulable suspicion to detain Defendant upon arrival at the hotel. The second issue is whether law enforcement's protective sweep of Defendant's hotel room was lawful. Third, if the protective sweep was unlawful, then the issue is whether the seized evidence is admissible under the doctrine of inevitable discovery.

*1. Officers' Detention of Defendant was Justified*

Law enforcement's detention of Defendant was objectively reasonable under the required Terry analysis. Law enforcement had reasonable, articulable suspicion that Defendant was engaged in the crime of domestic violence based upon information provided by Floyd's 911 call under Foreman, Williams, Critchfield and similar authority. Such authority calls for certain deference to the judgment of officers responding to a call for service in the face of reported violence.

What is more, Gump was justified in his confidence in the reliability of the information which Floyd relayed to 911 dispatch. U.S. v. Perkins, 363 F.3d 317, 323 (4th Cir. 2004). While Perkins addressed the question of whether an informant's tip gave rise to reasonable suspicion, its analysis informs the review in the instant matter. The 911 caller herein was not an "informant" *per se*. But the 911 call provided similar "indicia of reliability" as required under Perkins. In the instant matter, as evidenced in the CAD log, Floyd provided to dispatch her own name and telephone number, explained her relationship to one of the people involved in the situation for which she was calling for help. And she provided information about Defendant himself and the developing situation in which Defendant was involved which demonstrated the exigency (and potential danger) of the situation. Specifically, Floyd informed 911 dispatch that (1) Defendant and Knotts were involved in a "domestic," (2) Defendant and Knotts had "drove several hours for a drug deal," (3) Defendant had threatened Floyd (and arguably Knotts), saying "If she calls the cops I swear on my life [I'll] give her a reason for it," (4) Defendant's location at the hotel, (5) Defendant's name and physical description (gender, scars on face, possible color of hair), (6) the make and color of the vehicle in which Defendant and Knotts had been traveling, and (7) the possible room number in which Defendant would be located (which turned out incorrect but adjacent to the correct room). This information is detailed and precise. Furthermore, dispatch logged this information into CAD and relayed it to law enforcement in real-time, prior to Defendant's detention. From a commonsense perspective, Defendant's detention was objectively reasonable under Williams and Quarles.

In his motion, Defendant contends that the detention was unlawful because he was "not suspicious," and the victim of a "false report." Defendant emphasizes that Knotts asked Floyd to cancel the 911 call. At the hearing before the undersigned, Defendant testified that he did not have

21

an argument with Knotts, did not hit Knotts, did not threaten Floyd, and did not make the statement "If she calls the cops I swear on my life [I'll] give her a reason for it." Instead, Defendant testified that it was Knotts and Floyd who were arguing and that he was only trying to diffuse the argument between the two. However, the undersigned finds that Defendant's contentions and testimony are unpersuasive and self-serving.

What is more, the undersigned is persuaded by Knotts's and Floyd's testimony. Knotts testified that Defendant struck her in the face. Knotts informed Floyd about the domestic violence, and Defendant threatened Floyd (and, again, arguably Knotts, too). Further, the undersigned is persuaded by Knotts's explanation as to why she told Floyd to not call the police and why she denied to officers at the scene that there had been a domestic issue: she did not want to make the situation with Defendant worse, not that the domestic violence had not occurred. Furthermore, in her testimony, Floyd corroborated Knotts's account that Defendant was arguing and made a violent threat.

Accordingly, the undersigned finds that Floyd was a reliable source of information for officers responding to a potentially dangerous situation. The undersigned also finds that Floyd's 911 call provided sufficient reasonable suspicion to stop and detain Defendant. And as noted in the next part of the analysis, the drugs found on Defendant when officers stopped him gave rise to a both a legitimate arrest and sweep of the hotel room.

*2. The Protective Sweep of the Hotel Room was Lawful*

Law enforcement was justified in performing a protective sweep of the hotel room because there was clear, objective evidence of an a potentially dangerous situation, involving domestic violence and drug dealing. Straightforward information given in the 911 call was that Defendant and Knotts were trafficking drugs. Knotts herself confirmed the same during testimony at the

22

Suppression Hearing. Furthermore, as to the domestic violence, as in Gwinn, the officers here were responding to a potentially volatile domestic violence situation. The parties were known to law enforcement as habitual drug users, and information gleaned from the 911 call was that they had traveled several hours that day to purchase drugs. Officers also knew that Defendant had made a violent threat during the 911 call. Moreover, when they detained both Defendant and Knotts (occupants of the hotel room), officers found drugs on both. What is more, as Gump credibly explained, in his experience, 911 calls for domestic disputes necessarily give rise to concerns about weapons or other potential for physical harm.

Taken together, these facts would have led a reasonably prudent officer to perform a protective sweep of the hotel room for the immediate safety of all involved. Thus, the officers were justified in performing the protective sweep in response to a volatile domestic violence incident involving drug users who had effected a drug purchase earlier that day and appeared to be involved in drug trafficking.[5]

In his motion, Defendant argues that because, he was arrested in the parking lot of the hotel, a protective sweep of the room was not permitted. However, the fact that Defendant was ultimately arrested outside of the hotel room does not affect the protective sweep analysis. The call to which officers responded may have been a report concerning only two people, but without a protective sweep of the hotel room, they could not be assured of having accounted for dangerous conditions and spaces that had been in Defendant's control. More to the point, they would not be able to rule out the presence of additional persons of concern without performing the sweep. In fact, given the circumstances involving reported domestic violence and drug trafficking, it would be both odd and

---

[5] To be sure, Defendant testified that he and Knotts were not involved in drug trafficking that day, but instead had spent the day gambling. However, the undersigned finds Defendant's testimony on this point to be unconvincing. Knotts candidly acknowledged that they had gone to obtain drugs, and that was echoed by Floyd's 911 call.

concerning if officers had <u>not</u> conducted such a sweep. And notably, Defendant was not far removed from the hotel room – he was in the parking lot adjacent the facility. Accordingly, the undersigned finds that the protective sweep of Defendant's hotel room was lawful under <u>Buie</u> and <u>Laudermilt</u>.[6]

### 3. The Discovery of the Evidence in Defendant's Hotel Room was Inevitable

Finally, even if law enforcement's sweep of Defendant's hotel room was unlawful, the hotel housekeeping staff inevitably would have discovered the seized evidence. As such, it is admissible under <u>Nix</u> and <u>Bullette</u>. To be sure, the undersigned is unaware of any Fourth Circuit (or U.S. Supreme Court) caselaw regarding the applicability of the inevitable discovery doctrine to the specific fact pattern of housekeeping staff's inevitable discovery of evidence in a hotel room. However, the undersigned is persuaded by the reasoning set forth in the Eleventh Circuit's opinion in <u>Ross</u>, above.

To recap, both Defendant and Knotts were arrested and transported after officers discovered drugs on each of them. In the instant matter, analogous to <u>Ross</u>, hotel protocol is that Defendant's rental period would have been terminated the morning after his arrest, thereby terminating any reasonable expectation of privacy in the hotel room. As Broadwater testified, housekeeping staff would have then entered the room to clean it for the next occupant. Common sense is that staff, of course, would have discovered the firearms, ammunition, drugs, and drug paraphernalia located inside, and contacted law enforcement. Moreover, with Knotts having also been taken into custody, there was a negligible possibility that an intervening third party could

---

[6] While the parties do not raise it in their briefs, there was a discrepancy in witness testimony at the Suppression Hearing. Defendant testified unequivocally that any drugs in the hotel room were stored away. Knotts's recollection was less sure; while she recalled that any drugs were stored away, her testimony on this point was equivocal. Gump, on the other hand, testified as to drugs being in plain view. The undersigned finds Gump's testimony to be the most credible on this point.

have recovered the contraband from the hotel room before housekeeping staff entered. Therefore, the undersigned finds that the Government has, by a preponderance of the evidence, satisfied the two-prong test in Jenkins, and that the seized evidence in Defendant's hotel room should not be suppressed even if law enforcement's search was unlawful.

As an ancillary issue, in its response to the motion to suppress, the Government argues, alternatively, that the inevitable-discovery doctrine is applicable because law enforcement had probable cause to obtain a search warrant for Defendant's hotel room independent of the protective sweep. However, the record does not indicate that officers had taken steps to obtain a warrant prior to the purportedly unlawful sweep, contrary to the requirement in Allen. Thus, per Allen, the Government's alternative argument regarding the applicability of the inevitable-discovery doctrine should be rejected.

### IV. CONCLUSION

Accordingly, the undersigned **FINDS** that the Government *has* met its burden, by a preponderance of the evidence, to show the admissibility of the physical evidence seized without a warrant. Thus, for the reasons set forth herein, the undersigned **RECOMMENDS** that Defendant's motion to suppress [ECF No. 26] be **DENIED.**

Any party shall have fourteen (14) days from service of this Report and Recommendation to file with the Clerk of the Court **specific written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection.** A copy of such objections should also be submitted to the presiding United States District Judge. Objections shall not exceed ten (10) typewritten pages or twenty (20) handwritten pages, including exhibits, unless accompanied by a motion for leave to exceed the page limitations, consistent with LR PL P 12.

**Failure to timely file written objections to the Report and Recommendation as set forth above shall constitute a waiver of de novo review by the District Court and a waiver of appellate review by the Circuit Court of Appeals.** <u>Snyder v. Ridenour</u>, 889 F.2d 1363 (4th Cir. 1989); <u>Thomas v. Arn</u>, 474 U.S. 140 (1985); <u>Wright v. Collins</u>, 766 F.2d 841 (4th Cir. 1985); <u>United States v. Schronce</u>, 727 F.2d 91 (4th Cir. 1984).

The Clerk of Court is **DIRECTED** to transmit copies of this Report and Recommendation to counsel of record as provided in the Administrative Procedures for Electronic Case Filing in the United States District Court for the Northern District of West Virginia.

Respectfully submitted May 9, 2025.

MICHAEL JOHN ALOI
UNITED STATES MAGISTRATE JUDGE