IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

UNITED STATES OF AMERICA,

      Plaintiff,

  v.                               CRIMINAL NO. 1:24-CR-69
                                      (KLEEH)

JESSE YOUNG GOBER,

      Defendant.

MEMORANDUM OPINION AND ORDER ADOPTING IN PART
AND REJECTING IN PART REPORT AND RECOMMENDATION
[ECF NO. 42], AND GRANTING IN PART AND
DENYING IN PART MOTION TO SUPPRESS [ECF NO. 26]

Pending before the Court is a Report and Recommendation ("R&R") by the Magistrate Judge, recommending that the Court deny the Defendant's motion to suppress. For the reasons discussed below, the R&R is adopted in part and rejected in part, and the motion to suppress is granted in part and denied in part.

## I.    PROCEDURAL BACKGROUND

On November 5, 2024, the grand jury returned a five-count Indictment against Defendant Jesse Young Gober ("Gober"), charging him in Count One with Conspiracy to Possess with the Intent to Distribute and Distribute Controlled Substances, in violation of 21 U.S.C. §§ 846 and 841(b)(1)(C); in Count Two with Possession with Intent to Distribute 50 Grams or More of Methamphetamine, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(A)(viii); in Count Three with Possession with Intent to Distribute Forty Grams

**MEMORANDUM OPINION AND ORDER ADOPTING IN PART
AND REJECTING IN PART REPORT AND RECOMMENDATION
[ECF NO. 42], AND GRANTING IN PART AND
DENYING IN PART MOTION TO SUPPRESS [ECF NO. 26]**

---

or More of Fentanyl, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B)(vi); in Count Four with Possession with Intent to Distribute Cocaine Base, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C); and in Count Five with Possession of a Firearm in Furtherance of a Drug Trafficking Crime, in violation of 18 U.S.C. § 924(c)(1)(A)(i). See ECF No. 1.

On February 19, 2025, Gober moved to suppress the evidence supporting the charges in the Indictment, which includes methamphetamine, fentanyl, cocaine base, and firearms. See Mot. to Suppress, ECF No. 25, at 1. The evidence was seized on October 9, 2022, after law enforcement responded to a 911 call concerning a domestic dispute between Gober and his girlfriend. On April 21, 2025, the Magistrate Judge held an evidentiary hearing on the motion. On May 9, 2025, he entered an R&R recommending that the motion be denied. See ECF No. 42. On May 23, 2025, Gober filed objections to the R&R. See ECF No. 45.

## II.  FACTUAL BACKGROUND

On October 9, 2022, early in the morning, Gober and his girlfriend, Tammy Knotts ("Knotts"), drove from West Virginia to Ohio in a rental car and remained in Ohio for most of the day.

USA V. GOBER                                                    1:24-CR-69

### MEMORANDUM OPINION AND ORDER ADOPTING IN PART AND REJECTING IN PART REPORT AND RECOMMENDATION [ECF NO. 42], AND GRANTING IN PART AND DENYING IN PART MOTION TO SUPPRESS [ECF NO. 26]

Transcr., ECF No. 49, at 34:18-35:19; 75:4-5.[1]  Knotts testified that they went to Ohio to get drugs, but Gober testified that they went to Ohio to gamble.  Id. at 36:1-2; 71:5-15.  On the way back to West Virginia, Knotts drove while Gober slept in the passenger seat.  Id. at 65:2-6.  Gober testified that he remained asleep until they arrived at the Quality Inn in Pleasant Valley, West Virginia, where they had rented a hotel room in Gober's name.  Id. at 65:3-6; 36:3-11.

Gober testified that he awoke to the sound of Knotts and her mother, Brandy Floyd ("Floyd"), arguing on the phone.  Id. at 65:5-6.  Knotts, however, testified that she and Gober had been arguing and that Gober was also arguing with Floyd.  Id. at 37:7-9.  On the phone, Knotts told Floyd that Gober had hit her in the face.  Id. at 36:18-21.  Knotts testified to the same — specifically, she testified that Gober hit her while she was sitting in the rental car and he was standing outside.  Id. at 44:2-14.[2]  Floyd testified that while she and Knotts were on the phone, she heard Gober say something along the lines of, "If you call the cops, I swear on my

---

[1] Knotts testified that she and Gober would use drugs together, and Gober would sell drugs.  Transcr., ECF No. 49, at 33:2-9. Knotts is clean now and employed full time.  Id. at 34:8-17.
[2] Knotts also testified that the hit may not have been intentional. Id. at 36:16-21.

USA V. GOBER                                                    1:24-CR-69

**MEMORANDUM OPINION AND ORDER ADOPTING IN PART
AND REJECTING IN PART REPORT AND RECOMMENDATION
[ECF NO. 42], AND GRANTING IN PART AND
DENYING IN PART MOTION TO SUPPRESS [ECF NO. 26]**

life I'll give you a reason for it." Id. at 60:20-61:1. Gober denies making this statement and denies hitting Knotts. Id. at 65:24-66:2; 74:1-8. After Knotts told Floyd that Gober had hit her, Floyd called 911. Id. at 36:16-23. While Knotts was still on the phone with Floyd, she told Floyd not to call, or to "cancel" the call to, the police. Id. at 37:18-22. Knotts testified that she instructed Floyd to cancel the call because she did not want to make the argument any worse than it already was. Id. at 37:23-38:1. After Knotts got off the phone, she went into the hotel room. Id. at 36:25-37:3.

Floyd called 911 at approximately 7:46 p.m. and identified herself as Brandy Floyd. Id. at 4:21-5:2; Exh. 1, ECF No. 41-1. She told dispatch that her daughter had called her and informed her that she and her boyfriend, Jesse Gober, were involved in an "domestic" at the Quality Inn on Airport Road in Pleasant Valley, West Virginia. Transcr., ECF No. 49, at 4:21-5:2; Exh. 1, ECF No. 41-1. Floyd told dispatch that her daughter and Gober had driven several hours that day to conduct a drug deal for Gober's mother. Transcr., ECF No. 49, at 10:11-15; Exh. 1, ECF No. 41-1. Floyd told dispatch that she had heard Gober say, "If she calls the cops, I swear on my life I'll give her a reason for it." Transcr., ECF No. 49, at 10:22-23; Exh. 1, ECF No. 41-1. Floyd informed dispatch

4

USA V. GOBER                                                    1:24-CR-69

**MEMORANDUM OPINION AND ORDER ADOPTING IN PART
AND REJECTING IN PART REPORT AND RECOMMENDATION
[ECF NO. 42], AND GRANTING IN PART AND
DENYING IN PART MOTION TO SUPPRESS [ECF NO. 26]**

that Gober would be in the parking lot of the hotel, that he was a white male with scars on his face and possibly blond hair, that Gober and her daughter were driving a black Toyota rental car, and that they were possibly staying in Room 120 of the hotel. Exh. 1, ECF No. 41-1. Floyd also told dispatch that her daughter had asked her not to call, or to "cancel" the call to, the police. Transcr., ECF No. 49, at 11:8-10; Exh. 1, ECF No. 41-1. Roger Gump ("Gump"), a deputy with the Marion County Sheriff's Department, responded to the scene. Transcr., ECF No. 49, at 4:7-19. Gump arrived at the Quality Inn in five or ten minutes. Id. at 5:3-6. Deputy First Class Matthew Riffee ("Riffee"), also with the Marion County Sheriff's Department, responded as well but arrived in a different vehicle. Id. at 7:24-8:4.

Gump was already familiar with Gober and Knotts. Id. at 16:20-22. He had responded to their residence at least two times in the past. Id. at 16:23-25. On both occasions, Gober and Knotts had open sores on their faces and arms, indicating to Gump that they had been using drugs. Id. at 17:1-17:5. In Gump's experience with responding to domestic violence calls, he has seen weapons and has responded to situations where weapons were used. Id. at 16:6-16.

USA V. GOBER                                                    1:24-CR-69

**MEMORANDUM OPINION AND ORDER ADOPTING IN PART
AND REJECTING IN PART REPORT AND RECOMMENDATION
[ECF NO. 42], AND GRANTING IN PART AND
DENYING IN PART MOTION TO SUPPRESS [ECF NO. 26]**

Knotts testified that before she returned to the hotel room, Gober told her to give him his "shit," which she interpreted to mean the drugs, and she told him that she already did. Id. at 37:8-11. Gober, however, testified that while Knotts was fighting with Floyd, he gathered food from the rental car and went into the hotel room. Id. at 66:4-19. He testified that when he entered the room, there were no drugs or drug paraphernalia in plain view. Id. at 69:4-7. He testified that he believed the drugs were in a storage chest. Id. at 69:3-70:3. Knotts testified that she was "not real sure" if there were drugs or drug paraphernalia in plain view, but she did not see any. Id. at 43:9-44:1. She testified that the drugs were in a dresser and in a safe. Id. at 43:10-12. Gober testified that he set the food down and turned around to go back outside. Id. at 66:21-24. He testified that Knotts did not enter the room until he was leaving. Id. at 66:25-67:3. He testified that he went back to the parking lot where the rental car was parked. Id. at 67:10-13.

Gober testified that he was outside in the parking lot when an officer approached him, asked who he was, and asked what he was doing. Id. at 67:16-18. Based upon Gump's testimony, the Court concludes that the officer was Riffee. Id. at 12:5-24. Gober testified that he told the officer who he was, and the officer

USA V. GOBER                                                    1:24-CR-69

**MEMORANDUM OPINION AND ORDER ADOPTING IN PART
AND REJECTING IN PART REPORT AND RECOMMENDATION
[ECF NO. 42], AND GRANTING IN PART AND
DENYING IN PART MOTION TO SUPPRESS [ECF NO. 26]**

detained him. Id. at 67:19-24. Gober testified that he handed

the officer a container of what Gober thought was heroin:

> Q.   During that search, did you indicate that
>       you had any contraband on you?
>
> A.   Well, pretty much -- I mean, they'd -- as
>       they were going to search me, they did
>       ask me, you know, "For your own benefit
>       and for your" – "for your greater good,
>       is there anything in -- on -- in your
>       pockets or anything before we pat you
>       down?"
>
> Q.   And what did you provide them with?
>
> A.   I had handed them a plastic container
>       full of at the time what I thought was
>       heroin.
>
> Q.   Okay.  And was it a user quantity of
>       heroin?
>
> A.   Maybe -- maybe a half gram or less.

Id. at 67:25-68:11.  Gober testified that he was immediately placed

in the back of a police car and transported to the sheriff's

department.  Id. at 69:1-2.  Knotts testified that when the

officers arrived at the room, she and Gober "were at the door

together."  Id. at 40:19-24.  She testified that the officers

separated Gober from her.  Id. at 37:15-16.  She testified that

one officer took Gober outside and the other brought her into the

hallway.  Id. at 38:15-21.

USA V. GOBER                                                          1:24-CR-69

## MEMORANDUM OPINION AND ORDER ADOPTING IN PART AND REJECTING IN PART REPORT AND RECOMMENDATION [ECF NO. 42], AND GRANTING IN PART AND DENYING IN PART MOTION TO SUPPRESS [ECF NO. 26]

Gump testified that when he arrived at the Quality Inn, the door to the hotel was open, and he walked in. Id. at 27:10-28:12. He entered the hallway, accompanied by Trooper Mabin ("Mabin"). Id. at 11:20-22; 23:10-11. After determining that Room 120 was not the correct room, Gump knocked on Room 118, and Knotts exited. Id. at 11:22-12:2. Gump does not recall seeing Gober in or near Room 118. Id. at 12:3-7. Gump identified Knotts, detained her, and asked her to have a seat on the hallway floor. Id. at 12:8-13. Knotts told Gump that nothing had happened. Id. at 38:18-19. She did not have any bruises or marks on her. Id. at 42:15-17. Gump did not notice any wounds or blood, and Knotts did not tell him that she had been abused or subjected to violence by Gober. Id. at 30:12-22.

Gump testified that he did not conduct a pat-down of Knotts. Id. at 29:17-20. Knotts, however, testified that she was searched "as soon as" she was separated from Gober, and then she was detained because officers "found a tooter on [her]." Id. at 38:19-20; 41:12-13. Gump testified that his entire interaction with Knotts lasted two minutes. Id. at 24:1-6. He testified, "Got her ID and ID'd her and just had her stand by was about as much time as I had before I got called outside." Id. Riffee called Gump on the radio to come outside. Id. at 26:10-16. Mabin stood by Knotts

**MEMORANDUM OPINION AND ORDER ADOPTING IN PART
AND REJECTING IN PART REPORT AND RECOMMENDATION
[ECF NO. 42], AND GRANTING IN PART AND
DENYING IN PART MOTION TO SUPPRESS [ECF NO. 26]**

while Gump went outside. Id. at 12:12-13. When Gump went outside, Riffee, who had detained and conducted a pat-down of Gober, handed Gump a container with white powder in it. Id. at 12:20-21. Riffee told Gump that Gober had pulled the container out of his pocket and told Riffee that it was fentanyl. Id. at 12:21-23. At that time, Gober was placed under arrest, and Gump transported him to the station. Id. at 12:23-24. Gump testified that he "wasn't outside long" before Riffee took his place inside. Id. at 26:2-7.

At some point after Gump had gone outside, at least one other officer conducted a safety sweep of Room 118. Id. at 14:1-9. During the safety sweep, law enforcement seized two firearms, glass pipes, and an undetermined amount of methamphetamine. Id. Gump testified, as it had been relayed to him, that the methamphetamine was in plain view. Id. Gump, however, never entered the room and had not personally been in a position to see inside the room. Id. at 29:2-5. Gump testified that he did not see anything to indicate that another person was in the room. Id. at 29:9-12. He did not see any weapons when he was near the room. Id. at 29:21-23.

Gump prepared search warrants for the hotel room and the rental car. Id. at 12:25-13:2; Exh. 2, ECF No. 41-2. In the search warrant applications, Gump included information that was

**MEMORANDUM OPINION AND ORDER ADOPTING IN PART
AND REJECTING IN PART REPORT AND RECOMMENDATION
[ECF NO. 42], AND GRANTING IN PART AND
DENYING IN PART MOTION TO SUPPRESS [ECF NO. 26]**

relayed to him by Riffee: that "[a] safety sweep of Room 118 while speaking with the other party revealed two firearms, glass pipes, and an undetermined amount of methamphetamine in plain view in a bag on the one tier dresser." Exh. 2, ECF No. 41-2.  A state magistrate signed the warrants.  Id.  Law enforcement executed the search warrant for the hotel room and seized a Model 1933 black revolver, a HiPoint .380 ACP, ammunition, significant quantities of methamphetamine, fentanyl, and cocaine, $2,300.00 in cash, digital scales, fentanyl test strips, and other drug paraphernalia.  Resp., ECF No. 36, at 2; Exh. 2, ECF No. 41-2. Law enforcement also executed the search warrant for the rental car and seized an American Tactical Alpha rifle, a Ruger P89 9mm pistol, some marijuana and methamphetamine, and additional drug paraphernalia, among other items.  Resp., ECF No. 36, at 2; ECF No. 41-2.

When Knotts went to the police station, she told law enforcement that she did not know the drugs were in the room. Transcr., ECF No. 49, at 45:5-22.  She admitted in her hearing testimony that this was false.  Id.  Counsel for the Government also proffered that Knotts has entered into a plea agreement with the Government that covers use immunity and similar types of provisions.  Id. at 34:1-4.  Gober testified that he did not recall

10

MEMORANDUM OPINION AND ORDER ADOPTING IN PART
AND REJECTING IN PART REPORT AND RECOMMENDATION
[ECF NO. 42], AND GRANTING IN PART AND
DENYING IN PART MOTION TO SUPPRESS [ECF NO. 26]

any guns in the room and that the guns were in the vehicle. Id. at 71:16-18. Knotts testified that Gober had a gun with him that night, but she was not sure exactly where it was. Id. at 46:5-9.

Gump testified that given his knowledge of (1) Gober's and Knotts's previous drug use, (2) Floyd's report of their involvement in a drug deal that day, and (3) the vial of fentanyl handed over by Gober, Gump would have applied for a search warrant for the hotel room, regardless of whether law enforcement had seized any evidence during the safety sweep. Id. at 17:1-17. He also testified that Gober would have been arrested simply for the possession of fentanyl on his person. Id. at 18:24-19:4.

Agent Marcus Broadwater with the Bureau of Alcohol, Tobacco, Firearms, and Explosives interviewed the manager of the Quality Inn regarding some of the hotel's policies and protocols. Id. at 48:6-20. Generally, if a hotel guest is arrested, any remaining days on the guest's stay would be canceled. Id. at 49:18-50:7; 51:22-24. The following morning, the rental period would be terminated, and housekeeping would begin to prepare the room for the next guest. Id. at 51:25-52:1. If a staff member were to find firearms or drugs in a hotel room while cleaning, the staff member would immediately leave the room without touching anything else, inform someone at the front desk, and the person at the front

**MEMORANDUM OPINION AND ORDER ADOPTING IN PART AND REJECTING IN PART REPORT AND RECOMMENDATION [ECF NO. 42], AND GRANTING IN PART AND DENYING IN PART MOTION TO SUPPRESS [ECF NO. 26]**

desk would contact law enforcement. Id. at 52:16-25. Broadwater acknowledged that it is possible that a third party could come in, illegally, and take the drugs and firearms after a hotel occupant is arrested. Id. at 55:1-22.

### III. REPORT AND RECOMMENDATION AND OBJECTIONS

On May 9, 2025, the Magistrate Judge entered an R&R, finding that the initial stop of Gober was lawful, the protective sweep of the hotel room was lawful, the drugs seized from the protective sweep were in plain view, and the discovery of the evidence in the hotel room was inevitable. Gober timely filed objections to all four of the findings. The Court will conduct a de novo review of the R&R.

### IV. DISCUSSION

Gober moves to exclude all evidence in support of the Indictment, which includes evidence located in both the hotel room and the rental car. As discussed below, the Court finds that the Terry stop of Gober was lawful, that the protective sweep was unlawful, and that the evidence seized from the hotel room would have inevitably been discovered. The record does not establish, however, that the evidence from the rental car would have inevitably been discovered, and it will be excluded from evidence at trial.

12

**MEMORANDUM OPINION AND ORDER ADOPTING IN PART
AND REJECTING IN PART REPORT AND RECOMMENDATION
[ECF NO. 42], AND GRANTING IN PART AND
DENYING IN PART MOTION TO SUPPRESS [ECF NO. 26]**

> **A.  The <u>Terry</u> stop was reasonable because Riffee was
> responding to a credible report of domestic violence.**

The Fourth Amendment to the United States Constitution protects individuals against unreasonable searches and seizures. Brief investigative stops are permitted if they are based on "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." <u>Terry v. Ohio</u>, 392 U.S. 1, 21 (1968).  Accordingly, "[a]n officer may stop and briefly detain a person when the officer has reasonable, articulable suspicion that the person has been, is, or is about to be engaged in criminal activity." <u>United States v. Montieth</u>, 662 F.3d 660, 665 (4th Cir. 2011) (citations and internal quotation marks omitted).

Reasonable suspicion "defies precise definition." <u>United States v. McCoy</u>, 513 F.3d 405, 411 (4th Cir. 2008).  In determining whether reasonable suspicion exists, courts "look to the totality of the circumstances." <u>Id.</u>  The Supreme Court of the United States has "counseled lower courts to give due weight to the factual inferences drawn by police officers as they investigate crime[.]" <u>Id.</u> (citations and internal punctuation omitted). An officer "must have a particularized and objective basis for suspecting the

USA V. GOBER                                                    1:24-CR-69

**MEMORANDUM OPINION AND ORDER ADOPTING IN PART
AND REJECTING IN PART REPORT AND RECOMMENDATION
[ECF NO. 42], AND GRANTING IN PART AND
DENYING IN PART MOTION TO SUPPRESS [ECF NO. 26]**

particular person stopped of criminal activity." United States v. Cortez, 449 U.S. 411, 417-18 (1981) (citations omitted).

Here, although Riffee did not testify during the suppression hearing, the Court finds that he had reasonable suspicion to conduct a Terry stop of Gober. "Courts generally presume that a citizen-informant or a victim who discloses his or her identity and basis of knowledge to the police is both reliable and credible." United States v. Kehoe, 893 F.3d 232, 238 (4th Cir. 2018) (citations omitted). Floyd identified herself during the 911 call (as Brandy Floyd) and identified her basis of knowledge (her telephone call with her daughter). Floyd informed dispatch (1) that Gober and Knotts were involved in a "domestic," (2) that Gober and Knotts drove several hours for a drug deal that day, (3) that she had heard Gober say, "If she calls the cops, I swear on my life I'll give her a reason for it," (4) of Gober's location at the hotel, (5) of Gober's name and physical description (gender, scars on face, possible color of hair), (6) of the make and color of the vehicle in which Gober and Knotts had been traveling, and (7) of the possible room number in which Gober would be located (which turned out to be incorrect but adjacent to the correct room). The Court finds that Floyd's tip was reliable. The 911 dispatcher conveyed the information from Floyd's call to the

**MEMORANDUM OPINION AND ORDER ADOPTING IN PART
AND REJECTING IN PART REPORT AND RECOMMENDATION
[ECF NO. 42], AND GRANTING IN PART AND
DENYING IN PART MOTION TO SUPPRESS [ECF NO. 26]**

responding officers, which included Riffee.  Id. at 21:23-22:6;
Exh. 1, ECF No. 41-1.  To the extent Gober argues that there was
no longer a "domestic" situation because Knotts asked Floyd to
cancel the call, the Court is not convinced that Knotts asked Floyd
to cancel because Gober did not actually hit her; rather, Knotts
testified that she asked Floyd to cancel the call because she did
not want to make the argument worse.  Transcr., ECF No. 49, at
37:23-38:1.

When Riffee arrived at the hotel, he encountered and
identified Gober.  Although Riffee did not testify to his
reasonable suspicion, Riffee was responding to a reliable domestic
violence report, and this gave him reasonable suspicion to stop
Gober.  After the stop, Gober voluntarily handed Riffee the vial
of fentanyl that was in his pocket.  Accordingly, the Court finds
that Riffee's actions leading up to his obtaining the vial of
fentanyl were lawful.

   **B.   The protective sweep was unlawful because officers had
         no reason to believe that a third party was involved.**

A "well-settled exception to the warrant requirement" is
known as a "protective sweep":

> When police officers make an arrest at a home,
> they are entitled to perform a further
> "protective sweep" of the house when they have
> "articulable facts which, taken together with

**MEMORANDUM OPINION AND ORDER ADOPTING IN PART AND REJECTING IN PART REPORT AND RECOMMENDATION [ECF NO. 42], AND GRANTING IN PART AND DENYING IN PART MOTION TO SUPPRESS [ECF NO. 26]**

> the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene."

United States v. Laudermilt, 677 F.3d 605, 610 (4th Cir. 2012) (citations and some internal quotation marks omitted). Officers need more than a "generalized worry of danger" to conduct a protective sweep. United States v. Everett, 91 F.4th 698, 710 (4th Cir. 2024). They cannot rely on "mere inchoate and unparticularized suspicion or hunch that other dangerous individuals" are hiding in the residence. United States v. Jones, 667 F.3d 477, 484 (4th Cir. 2012) (citation and internal quotation marks omitted).

"A protective sweep is limited to cursory inspection of those spaces where a person may be found and should last no longer than it takes to complete the arrest and depart the premises." Laudermilt, 494 U.S. at 610 (citation and internal quotation marks omitted). The United States Court of Appeals for the Fourth Circuit has found that the "linchpin of the protective sweep analysis is not the threat posed by the arrestee, but the safety threat posed by the house, or more properly by the unseen third parties in the house." Id. (citations, internal punctuation, and internal quotation marks omitted). Hotel guests are entitled to

**MEMORANDUM OPINION AND ORDER ADOPTING IN PART
AND REJECTING IN PART REPORT AND RECOMMENDATION
[ECF NO. 42], AND GRANTING IN PART AND
DENYING IN PART MOTION TO SUPPRESS [ECF NO. 26]**

the same constitutional protections against unreasonable searches and seizures as are residents of a house. See Stoner v. State of Cal., 376 U.S. 483, 490 (1964).

In Laudermilt, Laudermilt's girlfriend called 911 and reported that he was at her home, threatening her and her family with a firearm. Laudermilt, 677 F.3d at 608. Multiple law enforcement officers responded to the call. Id. When they arrived, law enforcement personally observed Laudermilt standing outside the house, threatening his girlfriend and her family. Id. Officers arrested Laudermilt, and his girlfriend was outside, but the officers had been told by Laudermilt himself (and others) that at least one more person remained inside the home. Id. In addition, the firearm had not yet been recovered. Id. at 610. Officers then conducted a protective sweep, and the Fourth Circuit upheld the full extent of the sweep. Id. at 613.

Here, the record does not establish that a protective sweep was justified. As an initial matter, the record does not indicate who conducted the protective sweep. The officer or officers who conducted the protective sweep did not testify. Riffee told Gump what the protective sweep yielded, but the record does not indicate that Riffee himself conducted the sweep. Regardless, at the time of the protective sweep, based on the evidence presented, law

USA V. GOBER                                                    1:24-CR-69

**MEMORANDUM OPINION AND ORDER ADOPTING IN PART**
**AND REJECTING IN PART REPORT AND RECOMMENDATION**
**[ECF NO. 42], AND GRANTING IN PART AND**
**DENYING IN PART MOTION TO SUPPRESS [ECF NO. 26]**

enforcement had no reason to believe that a third person was in the hotel room. Gober had been detained in the parking lot, and Knotts had been detained in the hallway. The circumstances here are different from the circumstances in Lauderman. In Lauderman, officers had reason to believe that at least one person remained inside the home and that a firearm was inside the home. Here, there was never an indication that a third party was involved, and officers had no reason — at the time — to believe that a firearm was present. There was no "safety threat posed by the [hotel room], or more properly by unseen third parties in the [hotel room]," which is the "linchpin of the protective sweep analysis[.]" Laudermilt, 677 F.3d at 610. If, by chance, the officer or officers who conducted the sweep did not know that Gober had already been located, this fact should have been established in the record. It was not. Moreover, it is unlikely. Gump testified that Riffee took his place inside. Riffee, of course, knew that Gober had been detained. Accordingly, Defendant's second objection is sustained.[3]

_____

[3] Because the Court has found that the protective sweep was unlawful, it is unnecessary to consider whether drugs in the hotel room were in plain view.

MEMORANDUM OPINION AND ORDER ADOPTING IN PART
AND REJECTING IN PART REPORT AND RECOMMENDATION
[ECF NO. 42], AND GRANTING IN PART AND
DENYING IN PART MOTION TO SUPPRESS [ECF NO. 26]

C.    **The evidence in the hotel room, but not in the rental car, would have inevitably been discovered because Gump would have applied for a search warrant for the hotel room, regardless of the results of the protective sweep.**

"Derivative evidence, or 'fruit of the poisonous tree,' is evidence that 'has been come at by exploitation of [an] illegality . . . instead [of] means sufficiently distinguishable to be purged of the primary taint.'" United States v. Lentz, 524 F.3d 501, 522 (4th Cir. 2008) (citing Wong Sun v. United States, 371 U.S. 471, 488 (1963)).  Here, given that it was unlawful to conduct the protective sweep, and Gump relied on the protective sweep in applying for the search warrants for the hotel room and the rental car, the evidence seized from the hotel room and the rental car is derivative evidence, or fruit of the poisonous tree.  The Court must assess whether application of the exclusionary rule is warranted under the specific circumstances of this case.

The Supreme Court created the exclusionary rule "to safeguard against future violations of Fourth Amendment rights through the rule's general deterrent effect." Arizona v. Evans, 514 U.S. 1, 10 (1995) (citations omitted).  The exclusionary rule "generally prohibits the introduction at criminal trial of evidence obtained in violation of a defendant's Fourth Amendment rights," Pa. Bd. of Prob. & Parole v. Scott, 524 U.S. 357, 359 (1998), but the "sole

**MEMORANDUM OPINION AND ORDER ADOPTING IN PART
AND REJECTING IN PART REPORT AND RECOMMENDATION
[ECF NO. 42], AND GRANTING IN PART AND
DENYING IN PART MOTION TO SUPPRESS [ECF NO. 26]**

purpose" of the rule "is to deter future Fourth Amendment violations," Davis v. United States, 564 U.S. 229, 236-37 (2011), and its application "properly has been restricted to those situations in which its remedial purpose is effectively advanced." Illinois v. Krull, 480 U.S. 340, 347 (1987). As the Supreme Court has made clear, the exclusionary rule is not a "strict-liability regime," Davis, 564 U.S. at 240, and suppression of evidence "has always been [the] last resort, not [the] first impulse." Hudson v. Michigan, 547 U.S. 586, 591 (2006).

As United States District Judge Irene M. Keeley observed,

> The exclusionary rule is a drastic remedy that exacts a high social cost. See Nix v. Williams, 467 U.S. 431, 442, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984); Rakas v. Illinois, 439 U.S. 128, 137, 99 S.Ct. 421, 58 L.Ed.2d 387 (1978) (recognizing that "[e]ach time the exclusionary rule is applied it exacts a substantial social cost for the vindication of Fourth Amendment rights."). "The principal cost of applying the rule is, of course, letting guilty and possibly dangerous defendants go free — something that 'offends basic concepts of the criminal justice system.'" Herring v. U.S., 555 U.S. 135, 141, 129 S.Ct. 695, 172 L.Ed.2d 496 (2009) (quoting Leon, 468 U.S. at 908, 104 S.Ct. 3405). Consequently, defendants seeking to invoke the exclusionary rule face a "high obstacle" due to "the rule's costly toll upon truth-seeking and law enforcement objectives." Id. (quoting Pennsylvania Bd. of Probation and Parole v. Scott, 524 U.S. 357, 364-65, 118 S.Ct. 2014, 141 L.Ed.2d 344 (1998)). The paramount

**MEMORANDUM OPINION AND ORDER ADOPTING IN PART
AND REJECTING IN PART REPORT AND RECOMMENDATION
[ECF NO. 42], AND GRANTING IN PART AND
DENYING IN PART MOTION TO SUPPRESS [ECF NO. 26]**

purpose of the exclusionary rule is deterrence; ultimately, courts should only apply the exclusionary rule when "the benefits of deterrence [ ] outweigh the costs." Id. (citing Leon, 468 U.S. at 910, 104 S.Ct. 3405).

United States v. Lough, 221 F. Supp. 3d 770, 780 (N.D.W. Va. 2016), aff'd, 721 F. App'x 291 (4th Cir. 2018). "Exclusion exacts a heavy toll on both the judicial system and society at large" because it "almost always requires courts to ignore reliable, trustworthy evidence bearing on guilt or innocence," and "its bottom-line effect, in many cases, is to suppress the truth and set the criminal loose in the community without punishment." Davis, 564 U.S. at 237.

For the exclusionary rule "to be appropriate, the deterrence benefits of suppression must outweigh the rule's heavy costs." Id. "Police practices trigger the harsh sanction of exclusion only when they are deliberate enough to yield meaningful deterrence, and culpable enough to be worth the price paid by the justice system." Id. at 240 (citation and internal punctuation omitted). "When the police exhibit deliberate, reckless, or grossly negligent disregard for Fourth Amendment rights, the deterrent value of exclusion is strong and tends to outweigh the

**MEMORANDUM OPINION AND ORDER ADOPTING IN PART AND REJECTING IN PART REPORT AND RECOMMENDATION [ECF NO. 42], AND GRANTING IN PART AND DENYING IN PART MOTION TO SUPPRESS [ECF NO. 26]**

resulting costs." <u>Id.</u> at 238 (citation and internal punctuation omitted).

An exception to the exclusionary rule is the inevitable-discovery doctrine. The inevitable-discovery doctrine "allows the government to use information obtained from an otherwise unreasonable search if it can establish by a preponderance of the evidence that law enforcement would have ultimately or inevitably discovered the evidence by lawful means." <u>United States v. Bullette</u>, 854 F.3d 261, 265 (4th Cir. 2017) (citations and internal quotation marks omitted). The prosecution must prove by a preponderance of the evidence that (1) the police legally could have uncovered the evidence, and (2) the police would have done so. <u>United States v. Allen</u>, 159 F.3d 832, 840 (4th Cir. 1998).

### 1.  Hotel Room

Here, the record shows that the evidence in the hotel room would have inevitably been discovered, regardless of the protective sweep. Gump testified that regardless of the evidence seized during the sweep, given his knowledge of (1) Gober's and Knotts's previous drug use, (2) Floyd's report of their involvement in a drug deal that day, and (3) the vial of fentanyl obtained from Gober, he would have applied for a search warrant for the hotel room. Transcr., ECF No. 49, at 17:1-17. The Court has

**MEMORANDUM OPINION AND ORDER ADOPTING IN PART AND REJECTING IN PART REPORT AND RECOMMENDATION [ECF NO. 42], AND GRANTING IN PART AND DENYING IN PART MOTION TO SUPPRESS [ECF NO. 26]**

already found that Floyd's tip was reliable. If Gump were to apply for a search warrant based on these three facts, the warrant would be supported by probable cause. Based on Gump's testimony, the Court finds that the Government has established by a preponderance of the evidence that the evidence in the hotel room would have inevitably been discovered.

To the extent that the R&R explicitly rejected this reasoning, the Court finds that it was in error. In Allen, law enforcement found a duffel bag on a bus and searched it, claiming that it was abandoned, and connected its contents to Allen. Allen, 159 F.3d at 835. At the time, the police had already found marijuana in Allen's knapsack, they knew that he had traveled from New York (a known drug distribution point), and they knew that other passengers had disclaimed ownership of the duffel. Id. at 841. The Fourth Circuit recognized that this evidence may have supplied probable cause for a warrant. Id. The police, however, never sought a warrant. Id. The court, in discussing whether the inevitable-discovery doctrine should apply, wrote, "The existence of probable cause for a warrant, in and of itself and without any evidence that the police would have acted to obtain a warrant, does not trigger the inevitable discovery doctrine any more than probable cause, in and of itself, renders a warrantless search valid." Id.

USA V. GOBER                                                          1:24-CR-69

**MEMORANDUM OPINION AND ORDER ADOPTING IN PART
AND REJECTING IN PART REPORT AND RECOMMENDATION
[ECF NO. 42], AND GRANTING IN PART AND
DENYING IN PART MOTION TO SUPPRESS [ECF NO. 26]**

The court explained that some evidence that the police would have applied for a warrant is required:

> The doctrine may even apply where the subsequent search that inevitably would have uncovered the disputed evidence required a warrant and the police had probable cause to obtain this warrant prior to the unlawful search but failed to do so, *if* the government produces evidence that the police would have obtained the necessary warrant absent the illegal search. Such evidence might include proof that, based on independent evidence available at the time of the illegal search, the police obtained and executed a valid warrant subsequent to that unlawful search, . . . or took steps to obtain a warrant prior to the unlawful search.

Id. The Magistrate Judge misreads the case by finding that taking "steps to obtain a warrant prior to the unlawful search" is required in order for inevitable discovery to apply. R&R, ECF No. 42, at 25. It is not. It is, rather, one type of evidence that could show that law enforcement would have applied for a warrant. Here, importantly, we have such evidence, albeit of another type: Gump testified that he would have applied for a warrant based solely on his knowledge of (1) Gober's and Knotts's previous drug use, (2) Floyd's report of their involvement in a drug deal that day, and (3) the vial of fentanyl obtained from Gober. Transcr., ECF No. 49, at 17:1-17. No such testimony was elicited in Allen. Allen merely stands for the proposition that probable cause for a

24

**MEMORANDUM OPINION AND ORDER ADOPTING IN PART AND REJECTING IN PART REPORT AND RECOMMENDATION [ECF NO. 42], AND GRANTING IN PART AND DENYING IN PART MOTION TO SUPPRESS [ECF NO. 26]**

warrant, with nothing more, is not sufficient to show that the discovery of evidence was inevitable. Here, we have something more.

Although the Court believes that the discovery of the hotel room evidence was inevitable, the Court is not persuaded by the argument that the evidence would have been discovered by way of the hotel's policies. The R&R states that "both [Gober] and Knotts were arrested and transported after officers discovered drugs on each of them." R&R, ECF No. 42, at 24. The R&R also tends to assume that Knotts would have been arrested regardless of the results of the protective sweep. The Court disagrees. According to the CAD log, Gump was en route to the station with Gober at 20:05:06. Exh. 1, ECF No. 41-1. Knotts was not en route to the station until 20:23:11. Id. Nearly 20 minutes passed between Gump's interaction with Knotts and her arrest. Knotts's arrest was after the protective sweep but before the search warrants were executed. See Exh. 2, ECF No. 41-2 (referencing the safety sweep that occurred "while speaking with the other party," who is presumably Knotts"). Nothing in the record indicates that Knotts would have been arrested based solely on the "tooter" of fentanyl found on her person. Rather, it appears that Knotts's arrest was based upon the items found during the protective sweep.

USA V. GOBER                                                    1:24-CR-69

### MEMORANDUM OPINION AND ORDER ADOPTING IN PART AND REJECTING IN PART REPORT AND RECOMMENDATION [ECF NO. 42], AND GRANTING IN PART AND DENYING IN PART MOTION TO SUPPRESS [ECF NO. 26]

If the protective sweep had not occurred and Knotts were not arrested, the hotel room may not have been empty after Gober's arrest. Knotts may well have remained in the room. Broadwater testified to the hotel protocol that a rental period would be terminated the morning after an occupant's arrest. Transcr., ECF No. 49, at 51:25-52:1. Considering that Knotts could have remained in the room until morning, it is not inevitable that hotel staff would have discovered the evidence in the morning. Knotts could have moved the items. Accordingly, in finding that the evidence in the hotel room would have inevitably been discovered, the Court does not rely on hotel policies or protocol.

### 2.   Rental Car

While the Court has found that the evidence in the hotel room would have inevitably been discovered, it does not reach the same conclusion with respect to the evidence in the rental car. Gump never testified that he would have applied for a search warrant for the rental car regardless of the results of the protective sweep.[4]  The only potential link to the inevitable discovery of the items in the rental car is Gump's testimony that he would have arrested Gober regardless of the results of the protective sweep:

---

[4] The inevitable discovery analysis in the R&R also relates only to the hotel room and does not mention the rental car.

USA V. GOBER                                                    1:24-CR-69

MEMORANDUM OPINION AND ORDER ADOPTING IN PART
AND REJECTING IN PART REPORT AND RECOMMENDATION
[ECF NO. 42], AND GRANTING IN PART AND
DENYING IN PART MOTION TO SUPPRESS [ECF NO. 26]

---

> Q.    Based on those [three] factors that I
>       described to you, based on your ex- --
>       and based on your experience as a law
>       enforcement officer and your familiarity
>       with Mr. Gober and Ms. Knotts, did you
>       have a basis to arrest Mr. Gober, first
>       of all?
>
> A.    Yes.
>
> Q.    And based on your experience as a law
>       enforcement officer in those situations,
>       is -- would -- would it -- would you
>       typically arrest someone like Mr. Gober
>       in those circumstances?  Again, taking
>       out the information about the safety
>       sweep.
>
> A.    He would have been arrested just for the
>       possession of the fentanyl.

Transcr., ECF No. 49, at 18:19-19:4.  Gump, however, never linked the asserted inevitable arrest to a search of the rental car.  For example, it was not established through Gump's testimony that an inventory search or a search incident to arrest would have been conducted.[5]  Given that the Government bears the burden, it would be inappropriate for the Court to presume even the most basic of

---

[5] The Fourth Circuit has "never required the government to provide a written impoundment-and-inventory policy or elicit step-by-step testimony concerning such a policy to meet its burden under the inevitable-discovery doctrine," Bullette, 854 F.3d at 267, but, rather, the government can meet its burden "if the district court can assess the inevitability and reasonableness of a hypothetical inventory search from testimony provided by a law-enforcement official." Id.  No such testimony was elicited here.

**MEMORANDUM OPINION AND ORDER ADOPTING IN PART
AND REJECTING IN PART REPORT AND RECOMMENDATION
[ECF NO. 42], AND GRANTING IN PART AND
DENYING IN PART MOTION TO SUPPRESS [ECF NO. 26]**

law enforcement practices. Accordingly, the Court finds that the record does not establish that the evidence in the rental car would have inevitably been discovered.

Here, the need for deterrence is critical. The Supreme Court has long recognized the "centuries-old principle of respect for the privacy of the home," which is "entitled to special protection as the center of the private lives of our people[.]" Georgia v. Randolph, 547 U.S. 103, 115 (2006) (citations omitted). As discussed, a hotel room is afforded the same protection as a home under the law. See Stoner, 376 U.S. at 490. The protective sweep was undertaken without a constitutional basis. A well-trained officer should know that, before conducting a protective sweep of a hotel room, he or she needs a reason to believe that a third party could be in the room. While the inevitable-discovery doctrine prevents the application of the exclusionary rule with respect to the hotel room evidence, it does not apply with respect to the rental car evidence. Nothing indicates that the rental car evidence would have inevitably been discovered had the protective sweep not occurred. Deterring such investigatory tactics is worth the cost of excluding the rental car evidence here. Accordingly, the evidence seized from the rental car will be excluded at trial.

USA V. GOBER                                                    1:24-CR-69

**MEMORANDUM OPINION AND ORDER ADOPTING IN PART
AND REJECTING IN PART REPORT AND RECOMMENDATION
[ECF NO. 42], AND GRANTING IN PART AND
DENYING IN PART MOTION TO SUPPRESS [ECF NO. 26]**

## V.  CONCLUSION

For the reasons discussed, the R&R [ECF No. 42] is **ADOPTED IN PART**, to the extent that it reaches the same conclusions reached herein, and **REJECTED IN PART**, to the extent that it does not.  The motion to suppress [ECF No. 26] is **GRANTED IN PART** and **DENIED IN PART**.  At trial, the Government may not introduce evidence that was seized from Gober's rental car.

It is so **ORDERED.**

The Clerk is directed to transmit copies of this Memorandum Opinion and Order to counsel of record.

DATED: October 23, 2025

_____
THOMAS S. KLEEH, CHIEF JUDGE
NORTHERN DISTRICT OF WEST VIRGINIA